**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal No. 1: 21-cr-500 (CJN)** |
| **MICHAEL LEON BROCK** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**DEFENDANT MICHAEL LEON BROCK'S MOTION FOR CHANGE OF VENUE TO
THE NORTHERN DISTRICT OF MISSISSIPPI, OXFORD DIVISION**

**Comes Now Defendant Michael Leon Brock ("Brock"), through his undersigned counsel,
with this Motion to change venue for the trial in this case to the** Northern District of
Mississippi, Oxford Division. Brock makes this request pursuant to Federal Rule of
Criminal Procedure 21(a), and the Fifth and Sixth Amendments to the United
States Constitution.

> "[J]uries can bring strongly held views to the courtroom in criminal
> trials involving political subject matters, and those views can, in turn,
> affect the likelihood of obtaining a conviction, separate and apart from
> the strength of the actual evidence and despite a court's best efforts to
> empanel a fair and impartial jury."
>
> -- *John Durham, Special Counsel, Department of Justice*, REPORT ON
> MATTERS RELATED TO INTELLIGENCE ACTIVITIES AND INVESTIGATIONS
> ARISING OUT OF THE 2016 PRESIDENTIAL CAMPAIGNS, May 12, 2023[1]

---

[1] Available at https://www.justice.gov/storage/durhamreport.pdf.

The Defendant has no doubt that this Court would intend to do its best following the procedure set out in *United States v. Haldeman,* 559 F.2d 31 (D.C. Cir. 1976), using voir dire first to determine juror partiality and prejudice before considering changing venue. *Id.* at 62–64. However, the sentiment expressed by Special Counsel John Durham to Attorney General Merrick Garland this summer cannot be ignored. Given (a) the overwhelming presumption of guilt among prospective D.C. jurors toward January 6 defendants, (b) the fact that D.C. jurors are demonstrably more hostile towards January 6 defendants than adults surveyed nationwide, as well as in demographically comparable federal court divisions, (c) the impact of sustained and inflammatory media coverage of January 6 cases on the D.C. jury pool, and (d) the political subject matter that will encompass this trial, the Defendants believe that, despite this Court's best efforts to empanel a fair and impartial jury, their case involves the "extreme circumstances" that the court in *Haldeman* recognized demands "a change of venue prior to attempting selection of a jury" in order to preserve their right to due process. *See id.* at 60, 62. Special Counsel Durham's concern about juror prejudice in cases involving political subject matters (particularly ones that involve the actions of former President Donald J. Trump) undeniably recognizes a society dominated by electronic devices and social media that did not exist in 1976 when *Haldeman* was decided. Accordingly, this Court should move the Defendants trial to a district outside of the District of Columbia.

## ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. *See* U.S. CONST. amends. V, VI; *Skilling v. United States*, 561 U.S. 358, 377, 130

S. Ct. 2896, 2912, 177 L. Ed. 2d 619 (2010). The importance of an impartial jury is so fundamental to Due Process that, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court must transfer the proceedings upon the defendant's motion. *See* FED. R. CRIM. P. 21(a); *Skilling*, 561 U.S. at 378.

In some instances, the hostility of a venue is so severe that there can be "a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). In *Skilling*, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide trial and appellate courts in determining whether a presumption should attach: (1) "the size and characteristics of the community in which the crime occurred"; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[2] *Skilling*, 561 U.S. at 382–83.

Where presumption of prejudice attaches, the Supreme Court has further recognized that it overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Florida*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."). Indeed, on appeal of a denial

---

[2] Not relevant to the instant motion, the Supreme Court identified a fourth factor for consideration upon appellate review following trial in the contested venue: whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt. *Skilling*, 561 U.S. at 383.

of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, *voir dire* is not a cure for significant and substantiated Due Process concerns about the jury pool.

The Defendant submits that each of the three *Skilling* factors compels transfer of venue in this case.

### The survey data, size, and characteristics of the D.C. jury pool demonstrate that the presumption of juror prejudice attaches.

The foundation for the presumption of prejudice is found in *Rideau*, 373 U.S. at 727. In *Rideau*, half of the small jury pool had been exposed to prejudicial media — a widely-circulated video of the defendant's confession. *Id.* at 726. Despite *voir dire* revealing that only three seated jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that the video tainted was significant enough to render the defendant presumptively prejudiced. *Id.* at 725. In applying *Rideau*, many courts have focused on population size and diversity as a proxy for the population's share that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal: because Houston is the fourth-largest city in the United States and highly diverse, a significant number of prospective jurors would lack any connection to Enron. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

Three circumstances of the Defendants case distinguish it from *Skilling*: 1) the size and demographics of D.C., 2) the unprecedented impact of the event of January 6 on D.C. and its residents, and 3) the steady drumbeat of pretrial publicity. Therefore, this case more closely parallels the presumptively prejudicial circumstances in *Rideau*. Indeed, survey data confirms the conclusion that the Defendants will not be able to assemble a fair and impartial jury as the Constitution requires.

### 1. Survey data from multiple sources show that prejudice has attached in this District.

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for D.C. retained the services of the professionals of Select Litigation to survey the D.C. jury pool. As explained in its report ("SL Report"), attached as Exhibit 1, Select Litigation polled 400 potential D.C. jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia in ***January 2022,*** one year after the alleged actions of January 6, 2021. The FPD also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *See* Ex. 1, App. B.

Around the same time — ***between January 18 and 22, 2022*** — John Zogby of Zogby Strategies conducted his own survey of 400 D.C. registered voters on behalf of defendant Gabriel Garcia, No. 21-cr-129 (ABJ). His report ("Zogby Report") is attached as Exhibit 2.

Another survey was conducted by In Lux Research between ***February 14 and March 16, 2022***, on behalf of defendants Thomas Caldwell and Connie Meggs, No. 21-cr-028 (APM). Unlike the two previous reports, their report deployed an identical

5

community attitude study that surveyed four separate federal venue units, the United States District Court for the District of Columbia, the United States District Court for the Middle District of Florida – Ocala Division, the United States District Court for the Eastern District of North Carolina, and the United States District Court for the Eastern District of Virginia. Their findings are documented in their report ("ILR Report I") attached as Exhibit 3.

Finally, In Lux Research conducted another similar survey between *September 21 and October 9, 2022*, on behalf of defendants, Joseph R. Biggs, Zachary Rehl, Enrique Tarrio, Dominic J. Pezzola, and Ethan Nordean, No 21-cr-175 (TJK). Their findings are documented in their report ("ILR Report II") attached as Exhibit 4.

All these reports show the inescapable conclusion that prejudice has attached to the D.C. jury pool and, over the course of the year, changed very little.

## 2. Substantial majorities of potential jurors in D.C. have prejudged January 6 defendants

All four surveys of D.C. potential jurors showed that significant majorities have unfavorable impressions of January 6 defendants, have already concluded they are guilty, and have already concluded they had the specific intent to obstruct.

Exhibit 1 summarizes Select Litigation's findings. Highlights include that D.C. residents overwhelmingly:

- have unfavorable opinions of those arrested for participating in the January 6 demonstrations (84%); and

- would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54% respectively).

SL Report ¶¶ 9, 14. Significant majorities also:

- would characterize these individuals as "criminals" (62%); and

- have already formed the opinion that these individuals are people "guilty" of the charges brought against them (71%).

SL Report ¶¶ 14, 10.

Despite jurors' well-known duty not to determine guilt before hearing the evidence, over half of D.C. respondents admit that they are more likely to vote "guilty" if they find themselves on a jury in one of these cases (52%). SL Report ¶ 11. Equally alarming, one-third of D.C. respondents would not trust a D.C. jury to give them a fair trial if they were accused of violating the law on January 6th. SL Report ¶ 8 (reporting that only 67% of potential D.C. jurors stated that they believe that they personally would receive a fair trial if they were defendants in a January 6 case).

Further, the assessment of those respondents who claim that the January 6 defendants *can* get a fair trial is suspect. Of those who believe that January 6 defendants can get a fair trial in D.C., 76% have already decided that these defendants are guilty. *Id.* ¶ 12. Further, 56% of that group confessed that they would be more likely to vote "guilty" if they were on a jury. *Id.*

The Zogby Report reveals similar results. Highlights include:

- Nearly 3 out of 4 respondents (73%) believe that any individual who was inside the Capitol on January 6, 2021 should be convicted of insurrection. (Question 9).

- Seven out of 10 (70%) respondents believe that ANYONE who went inside the Capitol building that day were trying to stop the certification of the Electoral College vote for president. And almost two-thirds (63.9%) of respondents believe that despite not personally committing acts of vandalism or violence, an individual could still be held responsible for such serious crimes assuming they went inside the building that day (Questions 15 and 16).

ILR Report I shows even more disturbing findings. Indeed, 91% of the D.C.

respondents who answered the "pre-judgment test questions" admitted to making at least one prejudicial prejudgment. ILR Report I at 2. In that survey, 85% of the D.C. respondents characterized the events of January 6 as criminal in nature, even when given the option to reserve judgment on that question. *Id*. at 3. Seventy-two percent of the respondents said that they are likely to find the defendants guilty, even when given the choice "it is too early to decide." *Id*. The survey also demonstrates that the bias is far more prevalent among D.C. respondents than the three other judicial districts surveyed. ILR Report I, Table 1(A) and (B), Figure 1 and 2.

Perhaps most striking of all, the surveys show that an overwhelming percentage of D.C. residents have already made up their minds about an essential element for several counts in the Superseding Indictment. To prove that the Defendants knowingly entered a restricted building, the government must prove that they entered the Capitol building or grounds and knew it was restricted as defined by the statute. 18 U.S.C. § 1752. The ILR Report I showed that 71% of D.C. respondents believe that all who entered the Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. ILR Report I at 3. The median response in all the districts surveyed for that question was 49%. *Id*. Thus, not only have most D.C. respondents reached the broad conclusion that January 6 defendants are all "guilty," but the vast majority have prejudged an element essential to several charges in the case.

Then, demonstrating that time does no favor to temper these sentiments, ILR Report II reflected the following:

- 74% of D.C. Community respondents said that they are likely to find defendants guilty even when given the choice, "It is too early to decide."

- 87% of the D.C. Community characterizes the events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question.

- 61% of the D.C. Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve

This is the type of pernicious bias that a typical voir dire would not reveal as voir dire usually does not entail inquiring into jurors' ideas about each element of charged offenses. And asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See Smith v. Phillips*, 455 U.S. 209, 221–22, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it.").

The weight of these four different studies conducted at four different times is overwhelming. To put the findings into perspective, however, it is worth looking at what the surveys found in other judicial districts surveyed.

### 3. Survey results from other judicial districts show significant differences from the DC jury pool.

Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to D.C. SL Report ¶¶ 19–26. The results show that significantly fewer potential Atlanta jurors have set their minds against January 6 defendants. For example:

- 84% of D.C. survey respondents view people arrested in the wake of January 6th

unfavorably, but only 54% of Atlanta division respondents do;

- 71% of D.C. respondents believe that individuals charged are guilty, but only 54% of Atlanta division respondents share this opinion;

- More than half of D.C. respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;

- 62% of D.C. respondents characterize the January 6 defendants as "criminals," and well over 50% characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

SL Report ¶¶ 23, 24.

Select Litigation also asked both sets of survey respondents in D.C. and the Atlanta division to state whether they associated those who entered the Capitol on January 6 with certain purposes, a question that had also been asked in a recent national poll conducted by CBS/YouGov. SL Report ¶¶ 3, 18, 25. The results show that potential jurors in Atlanta hold prejudicial views on this issue at similar rates as national survey respondents. *Id.* ¶ 25. By contrast, a far greater share of D.C.'s potential jurors hold prejudicial views on this issue.

Both studies by InLux showed similar patterns. In their first study in February and March 2022 — where they surveyed three separate federal venue units: (1) the United States District Court for the Middle District of Florida – Ocala Division, (2) the United States District Court for the Eastern District of North Carolina, and (3) the United States District Court for the Eastern District of Virginia ("The Test

Areas"), in addition to the United States District Court for the District of Columbia — InLux noted that "while the Test Areas differ from each other in geographic location, demographic composition and political party alignment, the Test Areas produced remarkably similar results on most questions in the survey, ***with the DC Community standing apart***." ILR Report at 2 (emphasis added). "By measure, the DC Community attitude toward the Events of January 6th and toward all defendants associated with those events proves to be ***an outlier***." *Id.* (emphasis added). Furthermore, "[t]he response distributions from the DC Community deviate considerably from both the medians and means of the response distributions throughout the Study." *Id.*

As the report continued, "Key differences between the DC Community and other Test Areas fall into at least five general categories: (1) prejudgment, (2) personal impact and perceived victimization, (3) exposure to information related to the case(s), (4) recognition and disclosure of bias, and (5) eligible population size. *See generally id.* at 2–6.

Months later, InLux conducted a second survey, surveying two *different* federal district divisions — the United States District Court for the Middle District of Pennsylvania, the United States District Court for the Southern District of Florida, — in addition to United States District Court for the Eastern District of Virginia  and the District of Columbia as "Test Areas." ILR Report II at 1–2. InLux found that the D.C. Community's attitude toward Defendants was not only undeniably different than the Test Areas in this second survey, the responses also continued to differ from those Test Areas in their *original* survey. ILR Report II at 3. "This marked and

persistent deviation [was] statistically meaningful in the same five general categories as the first survey." *Id.* In short, even with the passage of some time, the jury pool in D.C. continued to show demonstrated bias compared to other federal districts.

### A. The size and makeup of the D.C juror pool ensures that prejudice has attached.

The District of Columbia is a compact major U.S. city and the smallest federal district in the nation. Unlike every other federal court district, the District Court of D.C. encompasses no rural areas whatsoever, and is <u>entirely composed of urban jurors</u>. Counsel respectfully submits that, due to the district's unique characteristics, prejudice has attached.

First, the government and the media have portrayed the events of January 6 as an attempt to overthrow the government – and an attack on democracy itself.[3] As the Court is aware, a large proportion of D.C. residents either work for the federal government themselves or have friends or family who do. As of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater D.C. area (not including postal workers, F.B.I. employees, and staff on several federal commissions).[4] Nearly 190,000 of those workers and annuitants work within D.C. itself. *Id*. With a total population of around

---

[3] *See, e.g.,* Kevin McCoy & Kevin Johnson, *Investigators Signal Some Capitol Riot Suspects Could Be Charged with Conspiring to Overthrow U.S. Government*, USA Today, (Feb. 19, 2021), https://www.usatoday.com/story/news/2021/02/19/capitol-riot-did-conspirators-try-overthrow-u-s-government/6750339002/; *see also The January 6 Attack on the U.S. Capitol*, American Oversight (Jan. 5, 2022), https://www.americanoversight.org/investigation/the-january-6-attack-on-the-u-s-capitol ("Trump supporters having for weeks discussed openly their plans for a violent overthrow.").

[4] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/

690,000,[5] it seems clear that any given member of the district's jury pool has a greater likelihood of being closely connected to the federal government than one in a comparable metro area. In fact, as of 2019, according to the D.C. Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in D.C. itself, which figure does not include the many retired and former federal employees living in D.C.[6]

**D.C. residents are far more likely than residents of any other location to work for the Federal government, which is a party to this case.**

Importantly, nearly 15,000 D.C. metro area residents work for Congress directly, each of whom have friends and family in D.C.[7] Many others have friends and family in law enforcement that responded to the Capitol on January 6.[8]

In sum, an enormous share of D.C. residents have connections with the federal

---

[5] District of Columbia Population – April 1, 2020, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/washingtoncitydistrictofcolumbia,US

[6] *Trends in Federal Employment in DC,* DC Pol'y Ctr. (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[7] *Vital Statistics on Congress,* Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[8] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025,* U.S. Cap. Police 1, 12 fig. 5 (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/ USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf, 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020,* Gov't D.C. Metro. Police Dep't 32 (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf ; *see also About Us,* DC Nat'l Guard (last visited Apr. 23, 2022), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt*, Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot,* N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. Celine Castronuovo, *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6,* The Hill (July 7, 2021, 11:01 AM)), https://thehill.com/policy/national-security/561832 -more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

government and entities that were directly affected by January 6. The quantity of such connections is unlikely to be present in any other district. Because the government and much of the media have characterized the events of January 6 — including the attempted obstruction in which the government alleges the Defendants participated — as an attack on our elections, government institutions generally, and democracy as a whole, a disproportionate number of D.C. residents are more likely to view themselves as the direct victims of the events. Stated differently, if the federal government is the victim of many of the offenses alleged against the Defendants, its employees and their families that consider it a monumental part of their lives cannot be expected to set aside those connections and be truly fair and impartial.

Additionally, in the days following January 6, the **D.C. Mayor** declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[9] Metropolitan Police and over 25,000 military personnel occupied D.C. neighborhoods in the weeks that followed.[10] Indeed, a local subsidiary of the national public broadcasting network, *D.C.ist*, reported that:

> Some residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […]

---

[9] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, Gov't D.C. Muriel Bowser, Mayor (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, Gov't D.C. Muriel Bowser, Mayor (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1.

[10] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021, 3:55 PM),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

> Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[11]

As the Court is no doubt aware, the effects of these events continue to be felt in D.C. Prior to protests to support detained January 6 defendants planned for September 2021, the Associated Press similarly reported, "In Edgy Washington, Police Outnumber Jan 6 Protestors."[12]

**The residents of D.C. are overwhelmingly politically hostile to January 6 defendants.**

Further, an overwhelming number of D.C. residents — **over 92 percent** — voted for President Biden.[13] According to the government's theory of the case, many of those who came to the Capitol in connection with January 6 acted to prevent Biden from becoming President. Again, this stark political divide (and impact on juror attitudes) would not be as uniformly present in a different jurisdiction.

Finally, the government, the media, and judges in this district speak of January 6 prosecutions as designed to prevent "another January 6."[14] As such, D.C. residents as jurors are highly likely to view the Defendants not only as someone who

---

[11] Jenny Gathright & Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021 12:27 PM), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

[12] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters

[13] *General Election 2020: Certified Results*, DC Bd. Elections (Dec. 2, 2020, 11:26 AM), https://electionresults.dcboe.org/election_results/2020-General-Election.

[14] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html; *see also* Jordan Fischer et. al, 'Resolving the crime of the century with misdemeanors' *Judge Skewers DOJ At January 6 Sentencing*, WUSA9 (Oct. 28, 2021, 2:47 PM), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae (explaining that the sentence was **designed to alert** "others who might consider attacking the Capitol to know their punishment would 'hurt.'").

victimized them, but also as someone who might victimize them again, raising a concern about conviction for prevention rather than the Defendants' individual guilt.

The survey results, size, and characteristics of the D.C. jury pool make clear that prejudice has attached, and that the Defendants cannot obtain a fair and impartial trial here.

**B. D.C. residents are disproportionately aligned with the Democratic Party which has an interest in convicting January 6 defendants to promote a particular narrative.**

Much of January 6 prosecutions are in furtherance of a political narrative: the narrative that Donald Trump's election-fraud claims in 2020 were baseless; and that Trump should be disqualified to run for reelection in 2024 because Trump improperly promoted or caused the riots of January 6, 2021. A subplot of this narrative is that Trump and "MAGA Republicans" who support Trump such as most of the January 6 defendants, are dangerous.  <u>Democratic Party officials, candidates, and voters</u> have an interest in promoting this narrative.  <u>And **convicting** as many January 6 defendants as possible helps further, foster, and promote this narrative</u>.

While 12% of Republicans and 52% of Independents believe that the event on January 6 was "an insurrection and a threat to democracy," an **overwhelming 86%** of Democrats believe this claim.  Domenico Montanaro, *A Majority Thinks Trump Is to Blame for Jan. 6 But Won't Face Charges, Poll Finds*, NPR (July 21, 2022), https://www.npr.org/2022/07/21/1112546450/a-majority-thinks-trump-is-to-blame-for-jan-6-but-wont-face-charges-poll-finds.

C. <u>Not only</u> are D.C. residents disproportionately politically hostile to January 6 defendants. <u>Not only</u> are D.C. residents more disproportionately aligned politically with Democratic Party—which <u>has an interest</u> in convicting January 6 defendants in order to promote and foster a political narrative. **But residents of D.C. are far more likely than people from any other location to be focused on politics as a major focus of their lives.**

16

**Google analytics** data shows that residents of D.C. are overwhelmingly more likely than people from any other location to search for certain terms using the largest internet search engine.  D.C. residents are many times more likely to search for "January 6," "Insurrection," "storm the Capitol," "Proud Boys," and "Oath Keepers" than residents of any other place. This is not only proof of political interest in the government's prosecution narrative; but proof of engagement and knowledge regarding the prosecution.  D.C. residents are literally and figuratively the peers and allies of the prosecution.

### D. Media coverage in the district also prejudices the Defendants.

The Sixth Amendment guards against jurors' conclusions being induced by "*any* outside influence" rather than "only by evidence and argument in open court[.]" *Skilling*, 571 U.S. at 378 (quoting *Patterson v. Colo. ex rel. Att'y Gen.*, 205 U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907)) (emphasis added). That outside influence can be "public print" *or* "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id.* at 437–38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"). The improper outside influence may be the *nature* of the media to which jurors have been exposed, or its prevalence close to the time of the trial, or its tendency to provoke identification with those directly affected by the conduct at issue such that the jurors feel a personal stake in the outcome. *See Skilling*, 561 U.S. at 372 (discussing broadcast of confession in small town in *Rideau*); *United States v.*

*McVeigh*, 918 F. Supp. 1467, 1473 (W.D. Okla. 1996). The outside influence may also be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh*, 918 F. Supp. at 1473.

Like the pretrial publicity in *Rideau* that led the Supreme Court to rule that the district court should have transferred the case to a new venue, the pretrial publicity about January 6 cases has "invited prejudgment of . . . culpability" and been of the "smoking gun variety." *Skilling*, 561 U.S. at 383.[15] In *Rideau,* the Court concluded that no *voir dire* could cleanse the taint of a video of the defendant's uncounseled interrogation and "confession," which had been broadcast in a small town several times before trial. *Rideau*, 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6 and hundreds of images of those events.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," the hundreds of January 6 videos and photos circulated over the last two and half years capture many of the alleged crimes themselves. *Skilling*, 561 U.S. at 382–83. Vivid images splashed across D.C. papers' websites and television for the last two and a half years show people scaling the Capitol walls,

---

[15] In *Skilling*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, as the Court noted, when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the district, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and (3) the time that has passed between periods of significant publicity and the trial. *Skilling*, 561 U.S. at 382-83; *id*. at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on congressional desks, hanging from the balconies in the Senate Chamber, and trying to break into the House chamber, among hundreds of other scenes.[16] Many of the images are "likely imprinted indelibly in the mind of anyone who [viewed them]." *See Skilling*, 561 at 382–83. Most, if not all this evidence has nothing to do with the Defendants or this prosecution, but because D.C. jurors have been inundated with these videos for over two years, they cannot be expected to "shut [them] from sight" during trial. *See Skilling*, 561 U.S. at 382.

As such, the pretrial publicity about January 6 has been "blatantly prejudicial," and is distinguishable from the type of press coverage that failed to convince the Supreme Court in *Skilling* that a change of venue was warranted. *See Skilling*, 561 U.S. at 382-83 (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking-gun variety" and was not so shocking that it could not be shut from jurors' minds during trial).

Moreover, data gathered by News Exposure establishes that coverage of January 6 has been extensive and persistent, particularly in D.C. In one year, D.C. newspapers published at least 500 articles about January 6, and local news syndicates broadcast over 7000 stories about the day. Ex. 1, App. B-7 (print data);

---

[16] *See, e.g.* Staff, *'No pictures, no pictures': The Enduring Images from Jan. 6*, The Washington Post (Jan. 4, 2022), https://www.washingtonpost.com/nation/interactive/2022/photos-jan-6-capitol/; *Chilling Images from the Capitol Riot: Jan. 6 Insurrection in Photos*, USA Today (Jan 5. 2022), https://www.usatoday.com/picture-gallery/news/politics/2022/01/03/jan-6-insurrection-photos-capitol-riot/9052798002/; D. Bennett, et al., *41 Minutes of Fear: A Video Timeline from Inside the Capitol Siege*, The Washington Post (Jan. 16, 2021), https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol-siege/.

App. B-1 (broadcast data).[17] This coverage is far more extensive and contemporaneous than that in *Skilling* with repeated trials involving January 6 . *See Skilling*, U.S. at 428-30 (Sotomayor, J., concurring in part and dissenting in part) (noting that it took multiple years between Enron's collapse and trial for there to accumulate hundreds of *Houston Chronicle* articles, and 1,600 local broadcast stories about Skilling); *McVeigh*, 918 F. Supp. at 1471 (noting how, in the weeks following the explosion, there was less media coverage of the explosion outside of Oklahoma, however, "Oklahoma coverage, in contrast, remained focused on the explosion and its aftermath for a much longer period of time. Television stations conducted their own investigations, interviewing 'eyewitnesses' and showing reconstructions and simulations of alleged events. Such 'investigative journalism' continued for more than four months after the explosion.").

News Exposure also analyzed coverage of January 6 in the Northern District of Georgia. SL Report ¶¶ 27-32. Comparison of coverage in this District to coverage in Atlanta reinforces how persistent coverage has been in D.C. The lowest month of January 6 coverage in D.C. still surpassed January 6 coverage in 9 out of 12 months in Atlanta. SL Report ¶ 30; *see also* Ex. 1, App. B-1, B-2 (August 2021 in D.C. had the lowest coverage of January 6 and, even then, it surpassed Atlanta's coverage in all but 3 months of the study). The data also show that D.C. print, broadcast, and web coverage of January 6 has exceeded Atlanta's almost every month and has far

---

[17] These estimates may understate coverage of January 6, as News Exposure only counted hits containing a short list of terms: "January 6 riot" or "Capitol insurrection" or "Capitol riot" or "2021 US Capitol attack" or "Capitol violence." The Washington, DC newspapers News Exposure considered were The Washington Post, The Washington Times, and Washington Examiner.

surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post.* SL Report ¶ 28.[18]

In short, the data shows that D.C. residents have been exposed to more constant coverage of January 6 than residents of a comparable district. Consequently, the Defendants maintain that this Court will be unable to seat a truly impartial jury in this district.

### E. Transferring this case out of the district is the only way to safeguard the Defendants' constitutional right to an impartial jury.

The Supreme Court has recognized certain conditions that make it more difficult for a juror to accurately assess her own bias or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 726-27 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine that in that case "due process of law. . . required a [transfer]"); *see also Irvin v. Dowd*, 366 U.S. 717, 728, 81 S. Ct. 1639, 1645, 6 L. Ed. 2d 751 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.'"). Judge Matsch described this sentiment perfectly in *McVeigh*:

The existence of such a prejudice is difficult to prove. Indeed it may go

---

[18] Again, the ILR Report supports the results of the Select Litigation Survey. Only 4.83% of District respondents said they "never or almost never" follow news coverage as opposed to 13.4% in the Eastern District of Virginia.  ILR Report, Table 1(C).

unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence. That something has its most powerful effect if it generates strong emotional responses and fits into a pattern of normative values.

*McVeigh*, 918 F. Supp. at 1472.

The presumption of juror prejudice here stems from the small size of this district, its many federal employees, the aftermath of January 6, and the political makeup of D.C., coupled with the government's theory of the case — which make this venue uniquely unlikely to produce an impartial jury. Data confirms extremely high levels of prejudice among potential jurors in this district. Most potential D.C. jurors have already made up their minds that the January 6 defendants are criminals. Many do not realize that they have already prejudged essential elements of the government's case. As a result, even those striving to be honest during *voir dire* and to meet their obligations as jurors, would nevertheless remain partial in ways that *voir dire* could not reveal. *See id.* at 1473 ("Properly motivated and carefully instructed jurors can and have exercised the discipline to disregard that kind of prior awareness. Trust in their ability to do so diminishes when the prior exposure is such that it evokes strong emotional responses or such an identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome. That is also true when there is such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience.").

Under these extreme and rare circumstances, prejudice must be presumed,

and the Court should transfer this case to another venue to preserve the Defendant's rights under to the Constitution, or at least pursuant to the Court's discretion under Rule 21. *See Skilling*, 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue would not violate the Constitution, and that it would not have been imprudent to transfer the *Skilling* case given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

### F. The judges, jurors, law clerks and court staff are all victims represented by D.C. authorities who are suing January 6ers.

Additionally, the prospective jurors, the trial judges of the U.S. District Court of the D.C., as well as their law clerks and judicial staff, are likely residents of the District of Columbia. As such they have a personal or legal interest in the outcome of the civil and criminal cases relating to January 6, 2021, and cannot preside over cases related to January 6,2021, consistent with constitutional due process. This situation is like nothing considered before by the rules for transfer of venue and recusal, including because the District of Columbia is a very compact jurisdiction also including the national seat of the U.S. Federal Government.

The Attorney General of the District of Columbia, <u>speaking for the entire District of Columbia, has stated that he and every resident of Washington, D.C. are victims</u>, directly or indirectly, of events in the District of Columbia culminating on or about January 6,2021. To the extent that the Attorney General avers that the finances and facilities of the District of Columbia were damaged by the events centered around January 6, 2021, every resident who pays taxes directly or through rent to a landlord (residential Washington, D.C. national capital, United

States, Britannica), https://www.britannica.com/place/Washington-DC or commercial) and the services that the city is able to provide are reduced due to the impact on the city's budget.

The District of Columbia has filed suit against a long list of J6 Defendants who allegedly victimized all residents of the District of Columbia either by costing the city substantial funds, terrorizing citizens and residents of Washington, D.C., impinging their rights, and implementing a conspiracy to do the same, primarily but not exclusively on or about January 6, 2021. ***Speaking for all residents*** and the Government of the District of Columbia, the lawsuit includes not only those who are citizens and residents of Washington, D.C., but rationally include anyone present in the District of Columbia on January 6, 2021, anyone using government services funded by the District of Columbia affected by the financial costs of events on January 6,2021, or even "terrorized" as frequent commuters into the District of Columbia not present in the city but made afraid of their next work day in the city in light of events. The District of Columbia filed in the U.S. District Court for the District of Columbia as Case No. l:21-cv-03267 with Amended Complaint filed on April 1, 2022, *District of Columbia v. Proud Boys International, L.L.C.* That and other civil cases cannot be heard by any judge of the U.S. District Court for the District of Columbia.

However, of infinitely greater significance, the Attorney General of Washington, D.C., has declared, alleged, and established on behalf of the District of Columbia that every resident-including judges-of the city was personally affected, a personal victim, of the alleged crimes and torts on or related to the events of January 6,2021. Therefore, all cases of any kind relating to the subject matters of *District of Columbia v. Proud Boys International, L.L.C* cannot be heard by any judge of the U.S. District Court for the District of Columbia. Arguably, even visiting judges who are working within the city are affected by the impact on the city's budget. The District of Columbia alleges "millions" of dollars of costs imposed upon the Metropolitan Police

Department of Washington, D.C. Therefore, according to the lawsuit, the personal safety of all judges and judicial personnel are affected by the reduced budget available to the MPD in the wake of January 6,2021. At least that is what the District of Columbia claims in the allegations of its lawsuit.

**All judges and jurors of the District have an interest in the outcome of these lawsuits.**

Nothing can create more of the appearance of a conflict of interest than when a presiding judge has a personal interest in the litigation or matters related to it. The applicable standard for recusal is whether a judge's participation in a lawsuit will create the appearance of bias and prejudice. See *Liteky v. United States*, 510 U.S. 540, 555 (1994)); *Jackson v. Microsoft Corp*., 135 F. Supp. 2d 38,40 (D.D.C. 2001), supra. Recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.'" And, indeed much more than an appearance of extra-judicial bias and conflicts of interest are at issue here. *Liteky v. United States*, 510 U.S. 540, 555 (1994)); *See also Jackson v. Microsoft Corp*., 135 F. Supp. 2d 38,40 (D.D.C. 2001) (recusal was proper because the judge "ha[d] created an appearance of personal bias or prejudice").

As explained in the legal opinion of Professor Ronald Rotunda, an expert on Professional Responsibility and Constitutional Law, District Judges (if residents of D.C.) now have an incurable personal interest in the case. Pursuant to Code of Conduct Canon 2(B) and Canon 3(C)(l)(d)(iii) and 28 U.S.C. § 455(a), District Judges's impartiality may reasonably be questioned, because the Judge (if a D.C. resident) has a personal interest running an inquiry concerning possible investigations of himself and his family, and also, according to Professor

Rotunda, because the transcript indicates District Judges investigating matters on his own outside of the evidentiary hearing.

In addition and separately, the language of the Judicial Code leaves no doubt that that recusal process is to be self-executing, as the judge should not unethically wait for a recusal motion to be filed. It [the Code of Conduct] is intended to be used by a judge at the start of each case as a checklist to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings ... [Even before appraising participation in the case under the [Judicial Code], the judge should first consult his own emotions and conscience, and pass an 'internal test of freedom' from disabling conflicts. Leslie W. Abramson, *Judicial Disqualification Under Canon 3 ofthe Code of Judicial Conduct* 10 (2d ed. 1992).

**All residents of D.C. were victimized by the curfews of Jan. 6.**

All residents of the city and those present in the city that day, were placed under a curfew. on January 6, 2021. See, Executive Office of the Mayor, "Mayor Orders Citywide Curfew Beginning at 6PM Today," January 6,2021, accessible at; https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pmtoday. And had access to free travel within the District of Columbia highly restricted for several months due to the militarized nature of the road closures, checkpoints and vast amount of fencing erected. Therefore, every citizen or person present within the city was personally, legally affected by the events centered around January 6,2021. This includes the Judges and judicial staff of the U.S. District for the District of Columbia The residents (jury pool) of the District of Columbia are overwhelmingly dependent upon employment of some member of their household by the U.S. Federal Government or by a vendor to the U.S. Government. Therefore, an overwhelming percentage of the potential juror pool is personally dependent upon the good will and good

graces of the U.S. Government and maintaining the favor of those who have a clearly-expressed, oft repeated, and loudly declared agenda with regard to the events of January 6, 2021.

**Thus the Court should disqualify itself from all criminal proceedings relating to the government's prosecutions of January 6, 2021, related cases and or defendants.**

Because all residents of D.C. are parties of interest against all J6 defendants, the court cannot fairly proceed against the defendant, or even preside over the defendant in D.C.  Venue must be transferred to an alternative appropriate venue, presumably where the Defendant resides.

### G.   THE NORTHERN DISTRICT OF MISSISSIPPI, OXFORD DIVISION

The Northern District of Mississippi, Oxford Division, is the district wherein Defendant Brock resides.  The District is politically, racially, and culturally diverse—unlike the District of D.C. (which is a Democratic Party and government stronghold). The Northern District of Mississippi would provide a fair cross-section of the community; without the inherent bias found in the District of Columbia.

The Northern District of Mississippi, Oxford Division is home to the University of Mississippi, and many other prominent Mississippi institutions.  It is the intellectual and cultural heart of Mississippi.

The government would face no prejudice trying its allegations in the Northern District of Mississippi.

**H. Conclusion**

For the foregoing reasons, Mr. Brock will not receive a fair trial by an impartial jury if this case remains in the District of Columbia, and he seeks to have the case transferred to a more appropriate venue.  The U.S. District of Mississippi, Oxford Division is the most likely, convenient,

Dated: September 6, 2023                                                            Respectfully Submitted,

*/s/ John M. Pierce*
John M. Pierce
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: jpierce@johnpiercelaw.com

**CERTIFICATE OF SERVICE**

I, John M. Pierce, hereby certify that on this day, September 6, 2023, I caused a copy of the foregoing document to be served on all counsel through the Court's CM/ECF case filing system.

/s/ John M. Pierce
John M. Pierce